# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 28, 2014 Session

## STATE OF TENNESSEE v. THOMAS WILLIAM BROWN

**Appeal from the Circuit Court for Williamson County**
**No. I-CR044799     Robbie T. Beal, Judge**

---

**No. M2013-02327-CCA-R3-CD - Filed February 3, 2015**

---

Appellant, Thomas William Brown, was convicted by a jury of attempted aggravated burglary and sentenced to four years in the Tennessee Department of Correction. On appeal, he argues that the trial court should have suppressed his statements to the police immediately after his arrest, that the evidence was contrary to the weight of the verdict, that the trial court erred by allowing the State to present evidence that witnesses identified appellant's shirt in a "show up" procedure, that the trial court erred by allowing the CAD Operational Report into evidence during the State's rebuttal proof, and that the trial court erred by denying a special jury instruction request. Following our careful review of the evidence, we have concluded that the evidence was insufficient to support appellant's conviction for attempted aggravated burglary and therefore reverse the judgment of the trial court. Appellant's charge is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

David L. Raybin and Vincent P. Wyatt (on appeal), Nashville, Tennessee; and Lee E. Dryer (at trial), Franklin, Tennessee, for the appellant, Thomas William Brown.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts

This case stems from two alleged attempted aggravated burglaries at a Franklin, Tennessee apartment on December 9, 2009. Appellant was arrested near the apartment that night and was later charged with two counts of attempted aggravated burglary and one count of possession of burglary tools. The trial court dismissed the possession of burglary tools charge after the State presented its proof during appellant's trial. The jury acquitted appellant of the first count of attempted aggravated burglary. The jury found him guilty of the second count of attempted aggravated burglary, and the trial court sentenced him to four years in the Tennessee Department of Correction.

At appellant's trial, Ashley Ruttencutter testified that on December 9, 2009, someone attempted to burglarize the apartment in which she lived with her mother. She said that she returned home from school between 3:00 and 3:30 p.m. that day and locked the deadbolt after she entered the apartment. She went upstairs and had begun doing homework when she heard someone "mess[ing] with the lock." Ashley[1] testified that she called out that she was coming but that she looked through the peep hole before opening the door. When she realized that she did not recognize the person at the door, she did not open it. Instead, she ran upstairs and called her mother. Her mother called the apartment complex to determine whether a maintenance worker was attempting to gain access to their apartment, but she was told that no one from the apartment complex should be at their apartment. Ashley testified that this incident occurred around 4:00 p.m. She further testified that the sound being made at the door was "louder than [the] normal sound of just a key going into the door." She said that based on what she observed, the door would have opened if the deadbolt had been unlocked. Ashley testified that the person she observed through the peep hole was a "hefty sized guy" with "salt and pepper colored hair" who was wearing "a jean[-]like – kind of like those flannel type shirts that has a collar." She was unsure whether the shirt had buttons. Ashley testified that soon thereafter, maintenance workers arrived at her apartment, including a worker named Ariel. She asked Ariel whether he had seen anyone, and he had not. Ariel changed the lock and told her that the lock "look[ed] like it[] [had] been messed with." Ashley said that "[t]here were scratches on the door that were not there before." She gave a report to the police that afternoon.

Ashley testified that later that night, around 10:00 p.m., her mother said she had "heard somebody at the door again" but thought that she might be "just paranoid, like maybe

---

[1] Because two witnesses share the same last name, we will refer to them by their first names to avoid confusion. We mean no disrespect by this practice.

[she was] imagining it." Ashley said that she did not personally see anything with regard to this second incident; however, her mother called 9-1-1, and the police soon arrived. Ashley said that while the police were talking to them, the officers "heard something in the woods." The officers left to investigate, and when they returned, the officers reported that "they caught the guy." The police showed her a shirt and asked her if it was the same, and she responded that it was. She testified that the shirt was "the exact same type of shirt that [she] described earlier." Ashley also identified the shirt, which had been preserved as evidence, in the courtroom.

On cross-examination, Ashley testified that she called her mother at 3:57 p.m. that day about the person trying to get into the apartment. She knew the exact time because her telephone recorded the time.

Tabitha Ray Ruttencutter, Ashley's mother, testified that Ashley called her during the afternoon of December 9, 2009, to tell her that someone was trying to get into their apartment. Tabitha called the apartment complex and asked them to send someone over to the apartment. She also called her ex-husband, Ashley's father, who in turn called the police. When Tabitha returned home, apartment custodians asked her whether to change the locks because "there was evidence . . . that somebody was trying to get in." She allowed the custodians to change the lock.

Tabitha testified that later that evening, she heard scratching at the door, "scratching inside the key hole," and heard "the door jiggling." She said that she was standing on the landing upstairs and that she saw the door handle "moving a little bit." The movement stopped and started again, "then all of a sudden a few seconds later the guy walked away." She said that she called the police when she realized that it was more than her imagination. Tabitha testified that this happened at 9:50 p.m. and recalled that she had looked at a clock. She said that she saw the man walking on the sidewalk outside her building. He had a duffle bag and was between 5'9" and 5'11". She said that he was "thick" and was wearing "a blue[-]like denim shirt . . . with blue jeans and a cap." Tabitha stated that the shirt was long-sleeved and was probably a button-up shirt because it had a collar. When asked how she knew that the man she saw through the window had been at her door, she stated,

> Because as soon as it stopped, the jiggling of the door and trying to open it, I seen [sic] a shadow on the window down there, because we have a window right downstairs to the left of the door, and I saw a shadow walk and then all of a sudden he appears right there.

Tabitha testified that she called 9-1-1. The State played a recording of the 9-1-1 tape for the jury. In the recording, Tabitha stated that the man she saw had dark hair. She clarified in her

testimony that she was not sure whether the man's hat or hair was dark. She said that the police had her identify a shirt, which she said was a long-sleeved, blue denim button-up shirt that "looked like the one that he was wearing." Tabitha testified that after this incident, the apartment complex placed a spotlight outside and gave her a "door jammer." She said that the person outside that night did not have permission to enter her home.

Franklin Police Officer Chris Hollingsworth testified that he responded to the Ruttencutters' first call during the afternoon of December 9, 2009. He said that he received the call at approximately 3:45 p.m. When he arrived, Ashley described the man she had seen through the peep hole. The maintenance workers had already changed the locks and disposed of the original lock. Later that evening, he heard over the radio that an officer was dispatched to the Ruttencutters' address, so he also responded. When he arrived, he interviewed the Ruttencutters and began to leave. However, as he was walking on the sidewalk, he "heard a noise that sounded as if someone was walking in the woods . . . across the road." He and other officers went to investigate. They shined their flashlights into the woods and heard someone moving quickly through the woods. Officer Hollingsworth "began running across that wood line when [he] observed a white male com[ing] out of the wood line." Officer Hollingsworth testified that the man was "medium sized" and was "in the process of removing a blue shirt." He observed that the man was "wet from head to toe from having crossed that creek." Officer Hollingsworth told the man to show his hands, and the man initially complied but then began "to manipulate something around his waist." The man threw off a glove and then turned to Officer Hollingsworth with his hands in the air. Officer Hollingsworth instructed the man to get on the ground. When the man complied, Officer Hollingsworth handcuffed him. The man's shirt and gloves were collected from the ground by other officers. Officer Hollingsworth asked the man for his name and address and inquired why he was at the apartments. The man responded that he was Thomas Brown and gave the officer his Franklin address on Gist Street. Appellant "said that he had been at dinner with a friend and was looking at the apartments, thinking of moving there." Officer Hollingsworth said that he "asked him why then was he in the woods because there was [sic] obviously no apartments in the wood line." Appellant replied "that he saw some people with some flashlights and he became scared, so he got into the wood line to . . . hide from them." Officer Hollingsworth placed appellant in the back of another officer's patrol car. He then helped gather evidence that appellant had dropped and returned to the apartment.

On cross-examination, Officer Hollingsworth agreed that the call for the second incident at the Ruttencutters' home came at 9:45 p.m. He further agreed that he did not record his interaction with appellant.

Franklin Police Officer Ryan Frazier testified that appellant sat in his patrol car the night of the alleged burglary while they waited for the investigating detective to come to the

scene. Officer Frazier said that appellant asked him what was going on. Officer Frazier told him that they were waiting for the detective. Officer Frazier recalled that appellant asked him to turn the heat down in the car. Appellant also told Officer Frazier, "'All I know is I went out to eat with my friend,'" "'I'm here looking for a place to stay and as soon as I can get out of here back to Florida, that's where I'm going,'" "'And that's my U-Haul right there,'" and "'I'm just wanting to go home.'" In response to everything appellant said, Officer Frazier testified that he "told him just to hold on, hang out" with the officer until the detective arrived. Officer Frazier said that he did not ask appellant any questions. Detective Robert Lindsey arrived and read appellant's constitutional rights to him, and then Officer Frazier transported appellant to the police station.

Franklin Police Officer Charlie Richards testified that he brought Titan, his K-9 partner, to the scene to see whether they could be of assistance to the investigation. Appellant had already been taken into custody by the time that Officer Richards arrived. Officer Richards said that he and Titan were standing on the road between the apartment complex and a subdivision when Titan began following a scent on his own volition. Titan led Officer Richards to the landscaped area at the front gates of the apartment complex. There, Officer Richards found an air compressor and a bag. The bag contained fittings for the air compressor, a set of earrings, and business cards on which were printed appellant's name. Another officer stayed with the bag, and Titan continued tracking the scent. Titan and Officer Richards went into the wooded area and through a creek. They did not find any other evidence along the way.

Franklin Police Officer Megan Valentin testified that she was in charge of collecting the evidence at the scene. She identified several items associated with this case: a jean jacket, a flannel shirt, a pair of gloves, a Nike hat, and a duffle bag containing a belt and a flashlight.

Ariel Ernesto Picado testified that he was the maintenance supervisor at the apartment complex where the Ruttencutters lived. On December 9, 2009, personnel from the apartment complex asked Mr. Picado to check the area around Building 9 because of a reported attempted burglary in that building. Mr. Picado and another gentleman looked around Buildings 9 and 10, the wooded area behind the buildings, and the road leading to a church down the hill, but they did not see anything. Mr. Picado testified that he replaced the deadbolt lock on the Ruttencutters' door. He said that the original lock "had some dents on it on the side, and the door had some scratches on it, like somebody was trying to pry it open." Mr. Picado said that he was called later that evening to inspect the Ruttencutters' door and to determine whether a man sitting in the backseat of a patrol car was a resident of the apartment complex. Mr. Picado testified that the man was not a resident. Regarding whether he saw appellant's U-Haul that day, Mr. Picado said that he saw the U-Haul before

receiving the first call. It was gone later in the day but was back when he received the second call. It was parked in a different manner, however. He recognized it as the same U-Haul because of the markings on it. Mr. Picado said that he changed the lock again the next day.

Detective Robert Lindsey testified that he was the lead investigator for these incidents. He first encountered appellant while appellant was sitting in Officer Frazier's patrol car. Detective Lindsey read appellant his constitutional rights, and appellant responded that "he'd be happy to speak to [Detective Lindsey] to clear up any misunderstanding of what was going on." Detective Lindsey testified that appellant

> said that he had been in the area looking at an apartment, and he was hoping to move back up there, and he was just over, looking to see if it was a place he wanted to move to, and that was his U-Haul and gave me consent to look into it.

Detective Lindsey opened the U-Haul and found three items of furniture inside. He also found a copy of the rental agreement. Detective Lindsey photographed the lock on the Ruttencutters' door and testified that "there were, what appeared to be, fresh scratches on the lock."

Detective Lindsey testified that appellant gave a formal statement at the police station. Appellant told Detective Lindsey that he had moved to Franklin after losing his job in Florida. He had recently lost his job in Franklin and was in the process of moving back to Florida, hence the U-Haul rental. He also told Detective Lindsey that "he liked the area so much, he thought about living here. . . . [T]he reason he was in the apartment complex was to see if it was some place he wanted to live." The address appellant gave as his home in Franklin was approximately five miles from the Ruttencutters' apartment.

Following Detective Lindsey's testimony, the State rested its case-in-chief. Appellant moved for a judgment of acquittal on all counts, and the trial court granted the motion as to the possession of burglary tools count.

Appellant presented several witnesses on his behalf. David Elder testified that he met appellant when appellant was a contractor for the company for which Mr. Elder worked. They shared a mutual hobby of "jeeping," and both participated in Jeep outings. Mr. Elder noted that appellant would collect rocks every place that they went. On December 9, 2009, Mr. Elder was in Nashville for work and learned that appellant was in the area. He called appellant, and they agreed to meet for dinner that evening and for Mr. Elder to help appellant move furniture. They met at a store so that they could go together to the restaurant, Macaroni

Grill. Mr. Elder testified that they arrived at the restaurant around 8:00 p.m. and left forty-five minutes later. They went to appellant's home and loaded furniture. Mr. Elder estimated that they moved furniture for over an hour. Mr. Elder did not know how long it took to drive from the restaurant to appellant's home.

Sheila Witt testified that she was friends with appellant. She recalled that on December 9, 2009, she gave appellant a ride from the airport to the U-Haul location. She picked him up around 2:30. She returned to work between 3:00 and 3:30.

Karen Brown, appellant's wife, testified that they had been married for twenty years. She said that appellant temporarily took a job in Franklin while "[h]e was trying to build up a business." Mrs. Brown testified that she and appellant collected rocks when they traveled. They used the rocks in their flower beds at their home in Florida. The jury was shown pictures of the flower beds. Mrs. Brown said that she and her children visited appellant in Tennessee in June 2009. She recalled that she and appellant had discussed relocating to Tennessee because they liked the area better than where they lived in Florida. Mrs. Brown said that on December 9, 2009, she drove appellant to the airport in Florida because he was going to fly to Tennessee to pack the remainder of his belongings. Appellant called her around 1:30 p.m. Eastern time and again around 6:00 p.m. Eastern time. She received a call from a Franklin Police officer using appellant's business telephone between 1:30 and 2:00 a.m. Central time on December 10. Mrs. Brown said that she was shocked when she learned that appellant had been arrested.

On cross-examination, Mrs. Brown testified that appellant had been planning on returning to Florida because his business, GEO Mobility, had entered into a contract with Rail America, in Jacksonville, Florida. He had been working for Smart Data Strategies in Franklin while waiting for his business to be awarded a contract. Mrs. Brown said that she could not recall what kind of luggage appellant took to the airport that day but that she remembered he carried clothes with him.

Appellant, testifying on his own behalf, said that he had been living in Franklin while he worked for Smart Data Strategies. His family visited him in June, and he discussed with his family the possibility of relocating to Franklin because he liked the outdoor lifestyle that the area offered. He recalled going with his family to the creek near the apartments where the Ruttencutters lived. They collected rocks there and played in the creek. He returned to Florida in October 2009 when his own company, GEO Mobility, received a contract in Florida with Rail America.

Appellant testified that he flew to Nashville on December 9, 2009, to pack up furniture at the apartment in which he had been living while he worked for Smart Data

-7-

Strategies. His wife drove him to the airport that day, and Sheila Witt picked him up. Because his flight had been delayed, he did not want to keep Ms. Witt away from her work any longer than necessary, so he had her drive him straight to the U-Haul rental location. Then, he returned to the airport to gather his luggage. He explained that the airline showed that he did not check any baggage because his luggage had originally been a carry-on bag. The bag would not fit in the overhead bins, so a flight attendant took it and instructed him to pick it up at the carousel upon landing. Appellant testified that he withdrew money from the teller machine at the airport at 3:29 p.m. He said that he recalled being there at that time and that his bank records also reflected the withdrawal. Appellant went straight to the apartment where he had been living in Franklin. He estimated that his apartment was twenty-eight to thirty miles from the airport. He stayed at his apartment until approximately 7:15 p.m., at which time he left to meet David Elder. He met Mr. Elder at 7:30, and they went to Macaroni Grill. The receipt showed that they paid for their dinner at 8:40 p.m. and left shortly thereafter. He and Mr. Elder went to his apartment and began moving furniture. Appellant estimated that they moved furniture for an hour.

Appellant testified that he then wanted to check out the Alara apartment complex, previously established as where the Ruttencutters lived, and gather rocks from the nearby creek. Appellant said that his wife wanted lots of rocks to complete some of their flower beds and that he only had that evening to go to the apartment complex because he was driving to his parents' house early the next day. He drove to the apartment complex and parked his U-Haul. Appellant said that he checked out the amenity area and then walked towards the creek. He saw what he thought was a rock near a planting bed in the apartment complex, but when he came closer, he realized it was a piece of equipment, specifically the air compressor about which the police testified earlier. He said that he "just . . . forgot" his bag by the air compressor. Appellant agreed that he owned two air compressors but stated that the air compressor at the apartment complex was not his. Appellant proceeded to the creek. He estimated that he arrived at the apartment complex at "probably 10:00, 10:20" and arrived at the creek at 10:25 p.m. Appellant testified that he fell into the creek and that it took him several seconds to extract himself from the water. He said that it was very cold and that he began taking his shirt off because it was wet. Appellant said that he heard yelling and saw flashlights, which "scared [him] a little bit." He stated that he had started taking his gloves off because they were hindering the removal of his shirt when he heard someone say, "'[G]et down on the ground.'" Appellant was not sure whether the person had identified himself as a police officer, but because the person sounded like a police officer, appellant complied with the order and was handcuffed. He recalled being asked why he was in the area and that Detective Lindsey read him his constitutional rights.

On cross-examination, appellant agreed that he never told the police about his intention to collect rocks at the creek. He said that he was never asked why he was at the

creek. Appellant stated, "I was asked why I was at the apartment complex. . . . It would be rather improper for me to say I was collecting rocks at the apartment complex." As to why he did not explain to the police that he had fallen in the creek while collecting rocks, appellant said that he was in shock to a certain extent due to the cold. Appellant did not believe that Detective Lindsey ever asked him why he had been at the creek.

In rebuttal, the State recalled Officer Hollingsworth to the stand. Officer Hollingsworth testified that a "CAD report is what the dispatch puts in to the computer when someone calls in to 9-1-1." He said that the report also details officer activity, such as when an officer is en route to a scene. Officer Hollingsworth testified that the dispatcher "should be typing those notes in the computer as the radio traffic is made relating to that call." He agreed that the report is kept in the ordinary course of business. He said that he could gain access to a CAD report by asking dispatchers for the report and that the CAD report was sometimes on the computer system that the police used to generate their reports. Officer Hollingsworth identified Exhibit 36 as "look[ing] like a standard CAD Operation Report from the dispatch of the police department" and that the details on the report "look[ed] like it belong[ed]" to the call from the Ruttencutters on December 9, 2009. Officer Hollingsworth testified that the document stated that the call from the Ruttencutters was received at 10:10 p.m., that a unit was dispatched at 10:13 p.m., and that he arrived at 10:22 p.m.

On cross-examination, Officer Hollingsworth agreed that his own report indicated that the Ruttencutters' call came at 21:45 (9:45 p.m.). He further agreed that he did not generate the CAD report and that he had no way of knowing whether the dispatcher's clock was incorrect. Officer Hollingsworth stated that he would "stand by the accuracy of [his own] report." He further stated, "I am not standing by the accuracy of anything other than what I wrote."

Following the close of proof and deliberations, the jury acquitted appellant of the first count of attempted aggravated burglary, which was related to the afternoon attempt to enter the Ruttencutters' apartment. The jury found appellant guilty of the second count of attempted aggravated burglary, relating to the incident at night. Subsequently, the trial court sentenced appellant to four years in the Tennessee Department of Correction. It is from this judgment that appellant now appeals.

## II. Analysis

On appeal, appellant argues that the trial court should have suppressed his statements to the police immediately after his arrest, that the evidence was contrary to the weight of the verdict, that the trial court erred by allowing the State to present evidence that the

Ruttencutters identified appellant's shirt in a "show up" procedure, that the trial court erred by allowing the CAD Operational Report into evidence during the State's rebuttal proof, and that the trial court erred by denying a special jury instruction request. Upon our review, we have determined that the trial court erred by admitting the CAD Operational Report and that the evidence was not sufficient to support the verdict. Appellant's remaining arguments are without merit. We will first address the CAD Operational Report and the sufficiency of the evidence and then review the remaining arguments in the interest of facilitating any future review of this case.

## A. Admissibility of CAD Operational Report

Appellant argues that the CAD Operational Report, introduced during Officer Hollingsworth's rebuttal testimony, was inadmissible under Tennessee Rule of Evidence 803(8) and was admitted without a proper foundation under Rule 803(6). The State responds that Officer Hollingsworth was a qualified witness under Rule 803(6) and that even if a proper foundation had not been laid, appellant failed to show prejudice from the admission of the report. The State did not address appellant's Rule 803(8) argument because it claims that the trial court ruled on the issue under Rule 803(6).

Initially, we note that the State is correct that the trial court ruled on the admissibility of the CAD Operational Report based on Rule 803(6). Furthermore, at trial, appellant based his objection on Rule 803(6), not Rule 803(8). Therefore, he has waived any argument based on Rule 803(8). *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We have deemed his Rule 803(6) argument to be meritorious, however.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible at trial unless it falls within an exception to the exclusionary rule. Tenn. R. Evid. 802. We are aware of the disagreement among panels of this court regarding the appropriate standard of review of the admissibility

of hearsay evidence;[2] however, for purposes of this case, the result is the same whether reviewed for abuse of discretion or de novo.

Tennessee Rule of Evidence 803(6), commonly called the business records exception, provides that records meeting the requirements of the rule are not excluded by the hearsay rule. Rule 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

"The foregoing exception 'rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable.'" *Arias v. Duro Standard Products Co.*, 303 S.W.3d 256, 262 (Tenn. 2010) (quoting *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995)).

Appellant's central argument is that Officer Hollingsworth was not a qualified witness with regard to Rule 803(6), and we agree. While the term "qualified witness" should be accorded a broad interpretation, "[t]o be considered qualified, a witness must be personally

---

[2] *See State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008) (in considering an issue involving hearsay, holding that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record"); *Pylant v. State*, 263 S.W.3d 864, 871 n.26 (Tenn. 2008) (maintaining that the standard of review for hearsay issues is abuse of discretion); *Willie Perry, Jr. v. State*, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *3 (Tenn. Crim. App. July 11, 2012), *perm. app. denied* (Tenn. 2012), (stating that standard of review for admissibility of evidence is abuse of discretion). *But see State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (stating that whether a statement is offered to prove the truth of the matter asserted is "necessarily a question of law" and is not subject to review under abuse of discretion standard); *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007) (holding that appellate review of hearsay issues is de novo with no presumption of correctness); *Willie Perry, Jr.,* 2012 WL 2849510, at *7 (Bivins, J., concurring) (applying de novo standard of review to hearsay issues).

familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures." *Inman*, 903 S.W.2d at 700. Officer Hollingsworth was certainly not the record custodian for the Williamson County dispatch office. He was a patrol officer who was only nominally familiar with dispatch procedure, as evidenced by his testimony that the dispatcher "should be typing those notes in the computer as the radio traffic is made relating to that call." He was able to testify that the report "look[ed] like" the report related to the alleged attempted aggravated burglary at the Ruttencutters' apartment and that the report was generated in the ordinary course of business. However, Officer Hollingsworth's testimony was not sufficient for this court to conclude that he was familiar enough with the procedure of the dispatch office to be a qualified witness. Moreover, Officer Hollingsworth's testimony also indicated a lack of trustworthiness in the CAD Operational Report because his own report indicated a different time for the incoming call. Thus, we conclude that the CAD Operational Report was admitted in error.

We must also conclude that the error was not harmless because the report, if correct, changed the timeline of events that evening and rendered appellant's alibi meaningless. With so little evidence available in this case, the prejudicial effect of the report was not inconsequential. Even if the evidence were otherwise sufficient to sustain appellant's conviction, this error would require reversal and remand for a new trial. *See State v. Gomez*, 367 S.W.3d 237, 249 (Tenn. 2012) ("Non-constitutional errors are harmful and demand reversal when 'considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'") (quoting Tenn. R. App. P. 36(b)).

## B. Sufficiency of the Evidence

Appellant contends that the evidence was not sufficient to support his conviction for attempted aggravated burglary.[3] Specifically, he contends that there was no evidence that he intended to commit a felony, theft, or assault or that the attempted entry was without the effective consent of the property owner. The State responds that the jury could infer his intent from his actions to attempt to enter the habitation.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

---

[3] Appellant's brief states that the verdict was contrary to the weight of the evidence and cites Tennessee Rule of Criminal Procedure 33(d), commonly referred to as the "thirteenth juror rule." However, his argument is essentially that the evidence was insufficient to uphold the conviction, not that the trial court improperly acted as the thirteenth juror.

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To support a conviction for attempted aggravated burglary, the State had to show beyond a reasonable doubt that appellant attempted to commit the burglary of a habitation. Tenn. Code Ann. § 39-14-403(a). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building . . . with intent to commit a felony, theft or assault." *Id.* § 39-14-402(a)(1). Burglary can be proven through direct or circumstantial evidence. *See State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). A person commits criminal attempt, as charged in this case, when he or she "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). The statute further clarifies that "[c]onduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

Viewed in the light most favorable to the State, the evidence at trial showed that Tabitha Ruttencutter saw her door handle moving and heard scratching at the door around 9:50 p.m. The scratching sound like it was "inside the keyhole," and the door handle was "jiggling." The movement stopped and restarted. She saw a shadow pass by the window next to the door and then saw a man walk by who was wearing a blue, collared shirt and was carrying a duffel bag. Approximately one-half hour later, appellant was found near the creek adjacent to the apartment complex. The shirt appellant had been wearing was shown to Mrs. Ruttencutter, and she said that it "looked like" the one worn by the person she saw walking by her apartment. A duffel bag was found on the apartment property, and appellant claimed that the bag was his. Detective Lindsey testified that he photographed the Ruttencutters' door knob and observed fresh scratch marks on it. In summary, whoever was outside of the Ruttencutters' apartment wiggled the door knob, did something that caused a scratching noise and left scratch marks, and then walked away. Based on this testimony, we cannot conclude that a crime was committed. To be sufficient to sustain his conviction, appellant's *entire course of action* had to be corroborative of the intent to commit the aggravated burglary, and there was not enough evidence in this case to show that the person outside the Ruttencutters' apartment was intending to burglarize the apartment. *Id.*

In other cases where convictions for attempted aggravated burglary have been upheld, there was more evidence than the evidence presented here. In *Reginald D. Terry*, the victim saw the defendant trying to get in through a window and then saw him hiding in front of the house. *State v. Reginald D. Terry*, No. W2000-00090-CCA-R3-CD, 2001 WL 721029, at *5 (Tenn. Crim. App. June 26, 2001). In *Tommy Lee Clark*, there were broken windows at both victims' houses, and the defendant was caught with his upper body through the window at one house. *State v. Tommy Lee Clark*, No. W2007-01829-CCA-R3-CD, 2008 WL 3342992, at *6 (Tenn. Crim. App. Aug. 11, 2008). In *Wesley M. Gifford, Jr.*, the defendant attempted to enter the home, made comments about what he wanted to do to the victim, and began masturbating. *State v. Wesley M. Gifford, Jr.*, No. M2013-00253-CCA-R3-CD, 2014 WL 345345, at *7 (Tenn. Crim. App. Jan. 30, 2014). In *Marty Mitchell Clark*, a witness saw the defendant trying to open a window. *State v. Marty Mitchell Clark*, No. W2005-01540-CCA-R3-CD, 2006 WL 1215144, at *4 (Tenn. Crim. App. May 5, 2006). In *Jimmy Bernard Clark*, the security sensors were activated, a door and a window were opened, and two subjects were seen fleeing the area. *State v. Jimmy Bernard Clark*, No. W2005-02081-CCA-R3-CD, 2006 WL 2668720, at *6 (Tenn. Crim. App. Sept. 18, 2006). In *Albert Lamont Bennett, Jr.*, the defendant threatened to kill the victim and then tried to get into the apartment where the victim had locked herself inside. *State v. Albert Lamont Bennett, Jr.*, No. M2012-01003-CCA-R3-CD, 2013 WL 4680408, at *6 (Tenn. Crim. App. Aug. 28, 2013), *perm. app. denied* (Tenn. Jan. 16, 2014). In *Tony Dixon*, the defendant tried to pry open a window, and his accomplice testified about his intent. *State v. Tony Dixon*, No.

E2011-00736-CCA-R3-CD, 2013 WL 2644029, at *6-7 (Tenn. Crim. App. June 11, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013).

After reviewing these cases and comparing them to the evidence presented herein, we conclude that the evidence was not sufficient to support appellant's conviction for attempted aggravated burglary. The person who was outside the apartment made only a cursory attempt at gaining entry by scratching at the door handle and moving it some. We cannot say that this cursory attempt represented an entire course of action that was corroborative of the intent to commit an aggravated burglary or that it constituted a substantial step toward the completion of an aggravated burglary, defined as the entering of a habitation, without the effective consent of the owner and with the intent to commit a felony, theft, or assault. *See* Tenn. Code Ann. §§ 39-14-402, -403. Therefore, we reverse the judgment of the trial court and dismiss appellant's charge.

## C. Motion to Suppress Statements

Appellant also argues that the trial court erred by not suppressing his statements to police made immediately after his arrest. The State responds that the trial court properly ruled that appellant's statements were admissible because he was not subjected to custodial interrogation without having been advised of his constitutional rights. We disagree with the State regarding statements made by appellant to Officer Hollingsworth but conclude that the error was harmless beyond a reasonable doubt. We agree with the State regarding statements made to Officer Frazier.

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

At the motion to suppress hearing, Officers Hollingsworth and Frazier and Detective Lindsey testified consistently with their trial testimony. In summary, Officer Hollingsworth first encountered appellant emerging from the woods, soaking wet. He handcuffed appellant and asked him who he was and why he was at the apartments. Appellant then waited in Officer Frazier's vehicle and made several comments to Officer Frazier, which are detailed above in the trial testimony. Officer Frazier told him to wait until a detective arrived. When Detective Lindsey arrived, he read appellant's constitutional rights to him. Appellant gave a short statement at the scene and a formal statement at the police station.

Due to "the inherently compelling pressures of in-custody interrogation," the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), "limited the admissibility of statements that would ordinarily meet the due process test of voluntariness" by establishing prophylactic rules designed "to permit a full opportunity to exercise the privilege against self-incrimination." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992)). Any statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" must be excluded "unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. These procedural safeguards require an officer to advise an accused prior to custodial interrogation or its functional equivalent

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479; *see also Rhode Island v. Innis*, 446 U.S. 291, 298 (1980); *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005).

On appeal, appellant argues that Officer Hollingsworth subjected him to an unwarned custodial interrogation or its functional equivalent. It is unquestioned that appellant was in custody and that Officer Hollingsworth did not give *Miranda* warnings to appellant. Therefore, the only issue that remains is whether Officer Hollingsworth's words and actions constituted an interrogation, its functional equivalent, or questioning that falls under an exception to *Miranda*. The United States Supreme Court in *Rhode Island v. Innis* provided the following guidance for lower courts:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police *(other than those normally attendant to arrest and custody)* that the police should know are reasonably likely to elicit an incriminating response from the suspect.

The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known were reasonably likely to elicit an incriminating response.*

*Innis*, 446 U.S. at 301-02 (emphasis added) (footnote call numbers omitted); *see also Sawyer*, 156 S.W.3d at 533.

In this case, Officer Hollingsworth handcuffed appellant and then asked him who he was and *why he was at the apartment complex*. Even if we could say that asking for appellant's identity amounted to words normally attendant to arrest, asking a suspect why he was at a particular location when investigating an attempted aggravated burglary is a question that a police officer should have known was reasonably likely to elicit an incriminating response. Therefore, the questioning constituted custodial interrogation and should have been preceeded by *Miranda* warnings. Because *Miranda* warnings were not given, the statements should have been excluded from the State's case-in-chief. *See State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (noting that "exclusion of the statements elicited during custodial interrogation 'is a complete and sufficient remedy for any perceived *Miranda* violation.'") (quoting *United States v. Patane*, 542 U.S. 630, 641-42 (2004) (plurality opinion)).

Nevertheless, the error in this case is harmless beyond a reasonable doubt. "The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error . . . ." *Id.* at 569. Therefore, to avoid reversal, the State has to show beyond a reasonable doubt that the error did not contribute to the verdict obtained. *Id.* (citations omitted). Here, appellant gave similar statements to Detective Lindsey after receiving the *Miranda* warnings and testified consistently with those statements at trial.[4] There was nothing particularly inculpatory in what he told Officer Hollingsworth. Thus, while the statements should have been suppressed, we conclude that in light of the evidence as a whole, the error did not contribute to the verdict obtained.

---

[4] We note that appellant has not argued for the suppression of subsequent statements made after receiving the *Miranda* warnings.

Regarding appellant's statements to Officer Frazier while seated in Officer Frazier's patrol car, the trial court properly ruled that these statements were spontaneous and not a result of custodial interrogation. "Volunteered statements of any kind are not barred by the Fifth Amendment[,] and their admissibility is not affected" by the holding of *Miranda*. *Miranda*, 384 U.S. at 478.

### D. Identification of Appellant's Clothing

Appellant contends that the on-scene and in-court identification of appellant's clothing (the long-sleeved shirt that he had removed prior to his arrest) by the Ruttencutters should be held to the same standard as that of show-up identifications of suspects. The State responds that appellant waived the argument when he did not object to the identification of the shirt contemporaneously at trial. We agree with the State. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

### E. Failure to Give Jury Instruction Regarding State's Duty to Preserve Evidence

Appellant argues that the trial court erred by not including an instruction to the jury regarding the State's duty to preserve evidence, premised on the police officers' failure to record the initial custodial interrogations of appellant. The State responds that the State did not have a duty to record those conversations and that the trial court properly denied appellant's request for the instruction. We agree with the State.

"A defendant has a constitutional right to a correct and complete charge of the law." *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). "When the trial judge gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction." *Id.* (citing *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)). Questions regarding the propriety of jury instructions are mixed questions of law and fact; thus, our standard of review is de novo with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Here, appellant requested that the trial court instruct the jury regarding the State's duty to preserve evidence because "police officers that arrived on the scene failed to preserve audiotaped recordings of their interviews" of appellant. Testimony at trial suggested that the police department's policy was to record custodial interrogations, but "neither the state nor the federal constitution requires electronic recording of interrogations." *State v. Godsey*, 60 S.W.3d 759, 771 (Tenn. 2001). Thus, the State did not have a duty to record the interactions

and could not have failed to preserve evidence that it did not record. Therefore, we conclude that the trial court did not err by denying the special jury instruction request.

## CONCLUSION

Based on our review of the record, the arguments of the parties, and the applicable law, we conclude that the evidence was not sufficient to sustain appellant's conviction and therefore reverse the judgment of the trial court.

_____

ROGER A. PAGE, JUDGE